# GENERAL TALKING PICTURES CORP. *v.* WESTERN ELECTRIC CO. ET AL.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 357. Argued December 13, 14, 1937.—Decided May 2, 1938.

*Messrs. Samuel E. Darby, Jr.* and *Ephraim Berliner* for petitioner.

*Mr. Merrell E. Clark,* with whom *Mr. Henry R. Ashton* was on the brief, for respondents.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Three suits were brought by respondents against petitioner in the district court for the southern district of New York to restrain infringements, based on different patents for inventions in vacuum tube amplifiers which have been used in wire and radio telephony, talking motion pictures, and other fields. In all there were in suit seven patents. The cases were tried together and are treated as one. The lower courts held one of the patents invalid, and that ruling is not challenged here. They con-

curred in holding six of the patents valid and infringed by petitioner. 16 F. Supp. 293; 91 F. (2d) 922. This Court granted a writ of certiorari.

Under the caption "Questions Presented" the petition for writ of certiorari submits the following:

"1. Can the owner of a patent, by means thereof, restrict the use made of a device manufactured under the patent, after the device has passed into the hands of a purchaser in the ordinary channels of trade, and full consideration paid therefor?

"2. Can a patent owner, merely by a 'license notice' attached to a device made under the patent, and sold in the ordinary channels of trade, place an enforceable restriction on the purchaser thereof as to the use to which the purchaser may put the device?

"3. Can an inventor who has filed an application for patent, showing and describing but not claiming certain inventions, obtain a valid patent for said inventions by voluntarily filing a 'divisional' or 'continuation' application for said unclaimed inventions more than two years subsequent to public use of the said unclaimed inventions by him or his assignee or licensee?"

The brief supporting the petition contains specifications of error relating to decision of two other questions. One is whether, by acceptance and retention of royalties paid by the licensed manufacturer, respondents acquiesced in the infringement and are estopped from maintaining the suit. The other is whether the patents upheld are invalid because of anticipation by, or want of invention over, the prior patented art. That brief is confined to the three questions definitely stated in the petition. But petitioner's brief on the merits extends to the additional questions reflected by the specification of errors.

1. Our consideration of the case will be limited to the questions specifically brought forward by the petition.

Rule 38, paragraph 2; contains the following. "The petition shall contain only a summary and short statement of the matter involved and the reasons relied on for the allowance of the writ. A supporting brief may be included in the petition, but, whether so included or presented separately, it must be direct, concise and in conformity with Rules 26 and 27. A failure to comply with these requirements will be a sufficient reason for denying the petition. . . ." Evidently petitioner, by the "Questions Presented" intended to state the issues it deemed to arise on its "statement of the matter involved," for neither the petition nor supporting brief purport to apply for review of any other question. Whether included in the petition, or separately presented, the supporting brief is not a part of the petition, at least for the purpose of stating the questions on which review is sought. The specifications of error in that brief do not expand or add to the questions stated in the petition; they serve merely to identify and challenge rulings upon which is grounded ultimate decision of the matter involved.

There is nothing in the lower courts' lecision on either of the added questions to warrant review here. Whether respondents acquiesced in the infringement and are estopped depends upon the facts. Granting of the writ would not be warranted merely to review the evidence or inferences drawn from it. *Southern Power Co.* v. *N. C. Public Service Co.,* 263 U. S. 508. *United States* v. *Johnston,* 268 U. S. 220, 227. Moreover, the decision on that point rests on concurrent findings. They are not to be disturbed unless plainly without support. *United States* v. *Chemical Foundation,* 272 U. S. 1, 14. *United States* v. *McGowan,* 290 U. S. 592. *Alabama Power Co.* v. *Ickes,* 302 U. S. 464. There is evidence to support them. Nor would the writ be granted to review the questions of anticipation and invention that petitioner argues, for as to

them there is no conflict between decisions of circuit courts of appeals. *Layne & Bowler Corp.* v. *Western Well Works,* 261 U. S. 387, 393. *Keller* v. *Adams-Campbell Co.,* 264 U. S. 314, 319–320. Cf. *Stilz* v. *United States,* 269 U. S. 144, 147–148. The writ did not issue to bring up either of these questions. *Crowell* v. *Benson,* 285 U. S. 22, 65.

One having obtained a writ of certiorari to review specified questions is not entitled here to obtain decision on any other issue. *Crown Cork & Seal Co.* v. *Gutmann Co., ante,* p. 159. Petitioner is not here entitled to decision on any question other than those formally presented by its petition for the writ.

2. The respondent American Telephone & Telegraph Co. owns the patents. Amplifiers having these inventions are used in different fields. One, known as the commercial field, includes talking picture equipment for theaters. Another, called the private field, embraces radio broadcast reception, radio amateur reception, and radio experimental reception. The other respondents are subsidiaries of the Telephone Company and exclusive licensees in the commercial field of recording and reproducing sound; during the time of the infringement alleged, they were engaged in making and supplying to theaters talking picture equipment including amplifiers embodying the inventions covered by the patents in suit. The petitioner also furnished to theaters talking picture equipment including amplifiers which embody the invention covered by the patents in suit. Respondents' charge is that by so doing petitioner infringes them.

The American Transformer Company was one of a number of manufacturers holding non-exclusive licenses limited to the manufacture and sale of the amplifiers for private use, as distinguished from commercial use. These licenses were granted by the Radio Corporation, acting for itself and the respondent Telephone Company, and

180 

were assented to by the latter. The Transformer Company's license was expressly confined to the right to manufacture and sell the patented amplifiers for radio amateur reception, radio experimenal reception, and home broadcast reception. It had no right to sell the amplifiers for use in theaters as a part of talking picture equipment.

Nevertheless, it knowingly did sell the amplifiers in controversy to petitioner for that use. Petitioner admits that the Transformer Company knew that the amplifiers it sold to petitioner were to be used in the motion picture industry. The petitioner, when purchasing from the Transformer Company for that use, had actual knowledge that the latter had no license to make such a sale. In compliance with a requirement of the license, the Transformer Company affixed to amplifiers sold by it under the license a notice stating in substance that the apparatus was licensed only for radio amateur, experimental and broadcast reception under the patents in question. To the amplifiers sold to petitioner outside the scope of the license, it also affixed notices in the form described, but they were intended by both parties to be disregarded.

Petitioner puts its first question in affirmative form: "The owner of a patent cannot, by means of the patent, restrict the use made of a device manufactured under the patent after the device has passed into the hands of a purchaser in the ordinary channels of trade and full consideration paid therefor." But that proposition ignores controlling facts. The patent owner did not sell to petitioner the amplifiers in question or authorize the Transformer Company to sell them or any amplifiers for use in theaters or any other commercial use. The sales made by the Transformer Company to petitioner were outside the scope of its license and not under the patent. Both parties knew that fact at the time of the transactions.

There is no ground for the assumption that petitioner was "a purchaser in the ordinary channels of trade."

The Transformer Company was not an assignee; it did not own the patents or any interest in them; it was a mere licensee under a non-exclusive license, amounting to no more than "a mere waiver of the right to sue." *De Forest Co.* v. *United States,* 273 U. S. 236, 242. Pertinent words of the license are these: "To manufacture . . . and to sell only for radio amateur reception, radio experimental reception and radio broadcast reception. . . ." Patent owners may grant licenses extending to all uses or limited to use in a defined field. *Rubber Company* v. *Goodyear,* 9 Wall. 788, 799–800. *Gamewell Fire-Alarm Telegraph Co.* v. *Brooklyn,* 14 Fed. 255. *Dorsey Rake Co.* v. *Bradley Co.,* Fed. Cas. No. 4,015, 7 Fed. Cas. 946, 947. Robinson on Patents, §§ 808, 824. Unquestionably, the owner of a patent may grant licenses to manufacture, use or sell upon conditions not inconsistent with the scope of the monopoly. *Bement* v. *National Harrow Co.,* 186 U. S. 70, 93. *United States* v. *General Electric Co.,* 272 U. S. 476, 489. There is here no attempt on the part of the patent owner to extend the scope of the monopoly beyond that contemplated by the patent statute. Cf. *Carbice Corp.* v. *American Patents Corp.,* 283 U. S. 27, 33. *Leitch Mfg. Co.* v. *Barber Co.,* 302 U. S. 458. There is no warrant for treating the sales of amplifiers to petitioner as if made under the patents or the authority of their owner. R. S. §§ 4884 and 4898 (35 U. S. C. §§ 40 and 47). *Moore* v. *Marsh,* 7 Wall. 515, 521. *Waterman* v. *Mackenzie,* 138 U. S. 252, 256. *Gayler* v. *Wilder,* 10 How. 477, 494. *United States* v. *General Electric Co., supra.* Robinson on Patents, §§ 762, 763, 792, 806 *et seq.*

The Transformer Company could not convey to petitioner what both knew it was not authorized to sell. *Mitchell* v. *Hawley,* 16 Wall. 544, 550. By knowingly making the sales to petitioner outside the scope of its

license, the Transformer Company infringed the patents embodied in the amplifiers. *Rubber Co.* v. *Goodyear, supra. Bement* v. *National Harrow Co., supra. United States* v. *General Electric Co.; supra. Vulcan Mfg. Co.* v. *Maytag Co.*, 73 F. (2d) 136, 139. *L. E. Waterman Co.* v. *Kline,* 234 Fed. 891, 893. *Porter Needle Co.* v. *Nat. Needle Co.*, 17 Fed. 536. Petitioner, having with knowledge of the facts bought at sales constituting infringement, did itself infringe the patents embodied in the amplifiers when it leased them for use as talking picture equipment in theaters. *Mitchell* v. *Hawley, ubi supra. American Cotton-Tie Supply Co.* v. *Bullard,* Fed. Cas. No. 294, 1 Fed. Cas. 625, 629, 630. See Robinson on Patents, § 824. See *Holiday* v. *Mattheson,* 24 Fed. 185, 186. *General Electric Co.* v. *Continental Lamp Works,* 280 Fed. 846, 851. As petitioner at the time it bought the amplifiers knew that the sales constituted infringement of the patents embodied in them, petitioner's second question, as to effect of the license notice, need not be considered.

3. Petitioner's affirmative statement of its third question is: "An inventor who has filed an application for patent showing and describing, but not claiming, certain inventions cannot obtain a valid patent for said inventions by voluntarily filing a 'divisional' or 'continuation' application for said unclaimed inventions more than two years subsequent to public use of the said unclaimed inventions by him or his assignee or licensee." It makes that contention as to four patents: Arnold Patent No. 1,403,475, dated January 17, 1922; Arnold Patent No. 1,465,332, dated April 21, 1923; Arnold Patent No. 1,329,283, dated January 27, 1920; and Arnold Patent No. 1,448,550, dated March 13, 1923.

The district court and circuit court of appeals found that there was no public use of either of the inventions of the first two patents prior to the filing dates of the di-

visional applications upon which they issued. These findings were made upon adequate evidence and petitioner's contentions as to them will not be considered here.

The subjects matter of the claims of the other two patents were disclosed in the original applications and were claimed in the continuation applications upon which they issued. The patentee's use was the only "public use" of the inventions covered by them. And that did not precede by as much as two years the filing of the original applications. The effective dates of the claims of the continuation applications are those of the original applications. In the absence of intervening adverse rights for more than two years prior to the continuation applications, they were in time.* R. S. § 4886 (35 U. S. C. § 31). *Crown Cork & Seal Co.* v. *Gutmann Co., ante,* p. 159.

*Affirmed.*

Mr. Justice Roberts, Mr. Justice Cardozo and Mr. Justice Reed took no part in the consideration or decision of this case.

Mr. Justice Black, dissenting.

The decisions in this case and *Crown Cork & Seal Co.* v. *Gutmann Co., ante,* p. 159, will inevitably result in a sweeping expansion of the statutory boundaries constitutionally fixed by Congress to limit the scope and duration of patent monopolies.

The area of the patent monopoly is expanded by the holding that the exclusive right granted an inventor to "make, use and vend" his patented commercial device, permits the inventor's corporate assignee (and other "patent pool" participants) to control how, and where the

* This sentence of the opinion is reported as amended by Order of May 16, 1938, *post,* p. 546.

device can be used by a purchaser who bought it in the open market.[1]

Petitioner bought amplifying tubes from the American Transformer Company, a licensee authorized to "manufacture . . . and sell only for radio amateur reception, radio experimental reception and radio broadcast reception." The devices are of a standard and uniform type generally useful in many "fields."

We are not here concerned with the right of respondents under the contract with the licensee, American Transformer Company. Respondents do not—in fact, could not—rely on the contract made with the Transformer Company, in this suit against petitioner which in no way was a party to that contract. If the Transformer Company violated its contract respondents' remedy was by suit against the Transformer Company for the breach. No question of malicious interference with contractual interests is presented. Respondents insist only that under their patents, they have the right to control the use of these widely used tubes in the hands of purchasers from one authorized by respondents to manufacture and sell them.

The mere fact that the purchaser of a standard and uniform piece of electrical equipment has knowledge that his vendor has contracted with an owner of a patent on the equipment not to sell the equipment for certain agreed purposes does not enlarge the scope or effect of the patent

---

[1] The patented device here is an amplifying tube, and the opinion of the District Judge stated: "The amplifying devices required tubes which the defendant procured in the open market by purchase from authorized distributors; each tube carton bore a license notice reading as follows:

'License Notice.

'In connection with devices it sells, Radio Corporation of America has rights under patents having claims (a) on the devices themselves and (b) on combination of the devices with other devices or elements, as for example in various circuits and hookups.'"

monopoly. The patent statute only gives the patentee the exclusive right to make, use and vend his patented article.

Where a licensee—authorized to manufacture and sell—contracts with the patentee to attach a notice to each patented article (a machine) of "the conditions of its use and the supplies which must be used in the operation of it, under pain of infringement of the patent," this Court has said: "The statutes relating to patents do not provide for any such notice and , . . [the patentee] can derive no aid from them . . . [in a suit against a purchaser from the licensee]. . . .

"The extent to which the use of the patented machine may validly be restricted to specific supplies or otherwise by special contract between the owner of a patent and the purchaser or licensee is a question outside the patent law and with it we are not here concerned." [2]

A patentee has no right under the patent laws to fix the resale price of his patented article [3] or to require that specified unpatented materials be used in conjunction with it. [4] The exclusive right to vend does not—any more than the exclusive right to use—empower a patentee to extend his monopoly into the country's channels of trade after manufacture and sale which passes title. It is not contended that petitioner did not obtain title to the tubes.

The patent statute which permits a patentee to "make, use and vend" confers no power to fix and restrict the uses to which a merchantable commodity can be put after

---

[2] *Motion Picture Co.* v. *Universal Film Co.*, 243 U. S. 502, 509; see *Keeler* v. *Standard Folding Bed Co.*, 157 U. S. 659.

[3] *Bauer & Cie* v. *O'Donnell*, 229 U. S. 1; *Straus* v. *Victor Talking Mach. Co.*, 243 U. S. 490; *Boston Store* v. *American Graphophone Co.*, 246 U. S. 8; cf. *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339.

[4] *Motion Picture Co.* v. *Universal Film Co., supra; Carbice Corp.* v. *American Patents Corp.*, 283 U. S. 27; *Leitch Mfg. Co.* v. *Barber Co.*, 302 U. S. 458.

it has been bought in the open market from one who was granted authority to manufacture and sell it. Neither the right to make, nor the right to use, nor the right to sell a chattel, includes the right—derived from patent monopoly apart from contract—to control the use of the same chattel by another who has purchased it. A license to sell a widely used merchantable chattel must be as to prospective purchasers—if anything—a transfer of the patentee's entire right to sell; it cannot—as to non-contracting parties—restrict the use of ordinary articles of purchase bought in the open market. "The words used in the statute are few, simple and familiar, . . . and their meaning would seem not to be doubtful if we can avoid reading into them that which they really do not contain." [5] Petitioner is held liable for using an ordinary vacuum amplifying tube bought from one who had title and the right to sell. Notice to petitioner that the vendor was violating *its* (the vendor's) contract with respondents gave the latter no right *under the patent* and imposed no responsibility *under the patent*. Petitioner became the owner of the tubes.

At this time a great portion of the common articles of commerce and trade is patented. A large part of the machinery and equipment used in producing goods throughout the country is patented. Many small parts essential to the operation of machinery are patented. Patented articles are everywhere. Those who acquire control of numerous patents, covering wide fields of industry and business, can—by virtue of their patents—wield tremendous influence on the commercial life of the nation. If the exclusive patent privilege to "make, use and vend" includes the further privilege after sale, to control—apart from contract—the use of all patented merchantable commodities, a still more sweeping power can be exercised by patent owners. This record indi-

---

[5] *Motion Picture Co.* v. *Universal Film Co., supra;* at 510.

cates the possible extent of a power to direct and censor the ultimate use of the multitudinous patented articles with which the nation's daily life is concerned.

This record shows that the General Electric Company system, the Radio Corporation system, and the American Telephone and Telegraph Company system are participants in a "patent pool." This "patent pool" controls respondents' patents. The record discloses that this "patent pool" operates under cross licensing agreements, in the United States and in foreign countries. It appears that the General Electric Company and the Radio Corporation have "agreed that the Radio Corporation shall not resell patented articles except as a part of the radio system," and that the Radio Corporation "agrees to use care not to enter with any patent device, process or system into the *field* of the General Electric Company or to encourage or aid others to do so." Throughout the entire agreement appears the manifest purpose of the "patent pool" participants to protect for each other certain allocated "fields" in the production, sale and distribution of modern electrical necessities used in everything involving modern communications. Although the patent laws contemplate and authorize but one patent monopoly for one invention, many separate patents authorizing single patent monopolies are merged in this "patent pool." Thus, all these separate patent monopolies are combined and in many respects are made to function as one. The record shows that from this larger combination—completely outside the conception in the patent statutes of single and separate monopolies—allotments of sub-monopolies are made in the respective "fields," from which emanate in turn other sub-monopolies. This Court has previously directed attention to the tendency of such combinations to stimulate patent law abuses, in the following language: "It was not until the time came in which the full possibilities seem first to have been appreciated of uniting, in one, many branches of business through corporate organiza-

tion and of gathering great profits in small payments, which are not realized or resented, from many, rather than smaller or even equal profits in larger payments, which are felt and may be refused, from a few, that it came to be thought that the 'right to use . . . the invention' of a patent gave to the patentee or his assigns the right to restrict the use of it to materials or supplies not described in the patent and not by its terms made a part of the thing patented." [6]

Articles manufactured under the patents thus controlled are widely used in the modern electrical field. The exclusive privilege to exercise the unrestrained power to determine the ultimate uses of all these important merchantable articles sold in the open market, is a power I do not believe Congress has conferred. A power so far reaching—apart from contract—has not been expressly granted in any statute, and should not be read into the law by implication.

*Second.* The numerous patents acquired by respondents all relate to claimed inventions made between 1912 and 1916; yet, some of these patents do not expire until 1940. Patent No. 1448550 illustrates most of the patents involved. It is designated as the "continuation" of two

---

[6] *Motion Picture Co.* v. *Universal Film Co. supra,* 513–514.

In the agreement between the General Electric Company and the American Telephone and Telegraph Company, this appears:

"Article VIII.

"Acquisition of Patent Rights.

"Neither party shall acquire from others rights to do under United States patents or inventions, or rights to use secret processes, applicable to *the fields of the other party, of such limited character* that the other party does not, by the operation of this agreement, receive licenses thereunder of the scope and within the respective fields herein set forth, unless the party proposing *to acquire such rights* shall first have given the other party an opportunity to be represented in the negotiations and thereby to acquire rights for its field."

earlier applications filed September 3, 1915 and November 2, 1915. February 3, 1919—more than four years after respondents' commercial use—the "continuation" application was filed and March 13, 1923, the patent was granted. By this process of "divisionals" or "continuations" a seventeen year patent monopoly is permitted to begin in 1923, theoretically based on original applications which were filed in 1915.

Congress has provided that two years' public use of an invention prior to application bars the right to patent[7] and no patent rights are awarded for disclosures in an application which are not claimed.[8] Here, however, approval is given patents for inventions—as the District Court found and the record shows—publicly used for more than two years before applications *actually claiming* the invention were filed. This approval is based on the fact that disclosures (unclaimed) were made in prior and separate applications which had not been preceded by two years' public use. "Divisional" or "continuation" applications—unauthorized by any statute—are permitted to give priority from the date of original applications, in effect barring all other inventions from that date and nullifying the statute of two years' public use. Thus for years respondents obtained no patent on their inventions for lack of claim. No one else could safely obtain a patent because of the certainty that respondents would later claim under a "divisional" or "continuation."

The statute provides no exception of public use by the inventor and, if he uses his *completed* invention in the ordinary conduct of his business—for more than two

---

[7] 35 U. S. C., c. 2, § 31.

[8] Cf., *The Corn-Planter Patent*, 23 Wall. 181, 224; *Miller* v. *Brass Co.*, 104 U. S. 350, 352; *McClain* v. *Ortmayer*, 141 U. S. 419, 423, 424; *Buffington's Iron Building Co.* v. *Eustis*, 65 Fed. 804, 807; *Ely Norris Safe Co.* v. *Mosler Safe Co.*, 62 F. (2d) 524, 526.

years prior to his application—the discovery is abandoned to the public and he cannot thereafter obtain a patent.[9] Such an exception—grafted onto the statute—would be directly contrary to its aim and purpose, and would enable inventors to obtain all the benefits of monopoly by simply making unclaimed disclosures, blanketing the field, and waiting until someone else attempted to *claim* a patent on the same invention. Then, by means of "divisional" or "continuation" applications, patent could be obtained. No such expansion of the patent statutes is justified.[10] I believe the judgment of the Court of Appeals should be reversed.

---

[9] "A single sale to another of such a machine as that shown to have been in use by the complainant more than two years prior to the date of his application would certainly have defeated his right to a patent; and yet, during that period in which its use by another would have defeated its right, he himself used it, for the same purpose for which it would have been used by a purchaser. Why should the similar use by himself not be counted as strongly against his rights as the use by another to whom he had sold it, unless his use was substantially with the motive and for the purpose, by further experiment, of completing the successful operation of his invention?" *Smith & Griggs Mfg. Co.* v. *Sprague,* 123 U. S. 249, 257; *International Tooth Crown Co.* v. *Gaylord,* 140 U. S. 55; see *A. Schrader's Sons, Inc.* v. *Wein Sales Corp.,* 9 F. (2d) 306, 208.

[10] Cf., "The patent law was designed for the public benefit, as well as for the benefit of inventors. . . .

" . . . A term of fourteen [now seventeen] years was deemed sufficient for the enjoyment of an exclusive right of an invention by the inventor; but if he may delay an application for his patent, at pleasure, although his invention be carried into public use, he may extend the period beyond what the law intended to give him." *Shaw* v. *Cooper,* 7 Pet. 292, 320, 322.