# United States Court of Appeals for the Federal Circuit

_____

**PERSONALIZED MEDIA COMMUNICATIONS, LLC,**
*Plaintiff-Appellant*

**v.**

**APPLE INC.,**
*Defendant-Appellee*

_____

2021-2275

_____

Appeal from the United States District Court for the Eastern District of Texas in No. 2:15-cv-01366-JRG-RSP, Chief Judge J. Rodney Gilstrap.

_____

Decided: January 20, 2023

_____

KEVIN PAUL MARTIN, Goodwin Procter LLP, Boston, MA, argued for plaintiff-appellant. Also represented by GERARD JUSTIN CEDRONE, DOUGLAS J. KLINE, LANA S. SHIFERMAN; WILLIAM M. JAY, Washington, DC; SIDNEY CALVIN CAPSHAW, III, Capshaw DeRieux LLP, Gladewater, TX.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC, argued for defendant-appellee. Also represented by NATHAN S. MAMMEN; GREG AROVAS, New York, NY; LUKE DAUCHOT, ELLISEN SHELTON TURNER, Los Angeles, CA; MARCUS EDWARD SERNEL, Chicago, IL.

JEFFREY A. LAMKEN, MoloLamken LLP, Washington, DC, for amicus curiae Fair Inventing Fund. Also represented by RAYINER HASHEM.

───────────────

Before REYNA, CHEN, and STARK, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* STARK.

REYNA, *Circuit Judge.*

Personalized Media Communications, LLC appeals the final judgment of the District Court for the Eastern District of Texas that U.S. Patent No. 8,191,091 is unenforceable based on prosecution laches. The district court determined that Personalized Media Communications successfully employed an inequitable scheme to extend its patent rights. Because the district court did not abuse its discretion in finding the patent unenforceable, we affirm.

## BACKGROUND

In 2015, Personalized Media Communications ("PMC") sued Apple in the U.S. District Court for the Eastern District of Texas, alleging that Apple FairPlay[1] infringed

───────────────

[1] FairPlay is a digital rights management technology that Apple uses on its computers, mobile phones, and other devices. J.A. 2 (FF 1). FairPlay is software that prevents Apple users from unauthorized uses of content—such as illegally copying songs on iTunes. J.A. 25 (FF 68); Resp. Br. 22. To protect content, FairPlay encrypts data and uses "decryption keys" to control decryption. J.A. 25–26 (FF 69–70). Recognizing that "the weakest link" in a system's security is the decryption key, Apple encrypted the decryption key as an additional layer of protection. *Id.*

claim 13 (and related dependent claims) of U.S. Patent No. 8,191,091 (the "'091 patent"). J.A. 2–3 (FF 1, 5). The case went to trial, where a jury returned a unanimous verdict, finding that Apple infringed at least one of claims 13–16. J.A. 3 (FF 5). The jury awarded PMC over $308 million in reasonable-royalty damages. *Id.*

Thereafter, the district court held a bench trial on remaining issues and found the '091 patent unenforceable based on prosecution laches. J.A. 1–3. Relying on our recent decision in *Hyatt*, the court determined that laches required a challenger to prove that the applicant's delay was unreasonable and inexcusable under the totality of the circumstances and that there was prejudice attributable to the delay. J.A. 28 (CL 4–7) (discussing *Hyatt v. Hirshfeld*, 998 F.3d 1347, 1359–62 (Fed. Cir. 2021)). Under this framework, the court found that PMC engaged in an unreasonable and unexplained delay amounting to an egregious abuse of the statutory patent system.

The court described our recent *Hyatt* decision as a "white horse" case, with "remarkably similar" facts. J.A. 32, 41 (CL 15). The court explained that the patentee in *Hyatt* had filed 381 GATT-Bubble applications, and PMC had filed 328 GATT-Bubble applications.[2]  J.A. 32

---

[2]    During negotiations of the Agreement on Trade-Related Aspects of Intellectual Property ("TRIPS Agreement") at the Uruguay Round of the General Agreement on Tariff and Trade ("GATT"), the U.S. agreed to change the term of U.S. patents from 17 years following the date of issuance to 20 years following the patent's priority date. *Hyatt*, 998 F.3d at 1352. In the months leading up to the law change, the U.S. Patent and Trademark Office ("PTO") saw an enormous influx of so-called "GATT Bubble" applications as applicants sought to take advantage of the existing law providing a patent term keyed from issuance. *Id.* at 1352–53.

(CL 16). In addition, the court noted that as in *Hyatt*, where each application was a photocopy of one of 11 earlier patent applications, PMC's applications derive from two earlier applications. J.A. 32 (CL 17). Similar to *Hyatt*, "PMC's applications . . . were 'atypically long and complex,'" containing over 500 pages of text and over 22 pages of figures. J.A. 33 (CL 20). And PMC filed each of its applications with a single claim, then subsequently amended the claims, sometimes to recite identical language across different applications. J.A. 33 (CL 19). The court further explained that, like in *Hyatt*, "[o]ver time, PMC [] greatly increase[d] the total number of claims" in the range of 6,000 to 20,000 claims. J.A. 10, 33–34 (FF 31, CL 21).

The court also found the length of the delay similar to *Hyatt* because "PMC waited eight to fourteen years to file its patent applications and at least sixteen years to present the asserted claims for examination." J.A. 32–33 (CL 18) (explaining that the applicant in *Hyatt* argued that he "delayed only seven to 11 years to file the four applications at issue and between 10 and 19 years before presenting the claims now in dispute" (citing *Hyatt*, 998 F.3d at 1368)). Moreover, "as in *Hyatt*, even though the PTO suspended prosecution of PMC's applications, such is directly attributable to the manner in which PMC prosecuted its applications in the first place." J.A. 35 (CL 25). The court reasoned that "PMC's prosecution conduct made it virtually impossible for the PTO to conduct double patenting, priority, or written description analyses." J.A. 37 (CL 31). In addition to the scope and nature of PMC's applications, the court pointed to PMC's vast prior art disclosure, which included references having little-to-no relevance, and examiners' statements in office actions describing PMC's prosecution strategy and conduct as improper. J.A. 37–38 (CL 31, 34); J.A. 47–78 (listing references filling more than 30 pages). Regardless, prosecution had been pending for "nearly ten years" before the PTO suspended it. J.A. 35 (CL 25).

"The only notable distinction" the court found between *Hyatt* and this case was that "Mr. Hyatt acknowledged he lacked a 'master plan' for demarcating his applications" whereas PMC developed the "Consolidation Agreement" with the PTO. J.A. 34 (CL 23). Under the Consolidation Agreement, PMC agreed to group its applications into 56 subject-matter categories, with subcategories for each of the two priority dates. J.A. 14 (FF 39); J.A. 8081–82. Within the categories, PMC was to designate "A" applications and "B" applications, with the PTO prioritizing "A" applications. *Id.* Rejected claims would transfer to the corresponding "B" application and prosecution of "B" applications was stayed until the corresponding "A" application issued. *Id.* PMC would abandon any remaining applications that were not designated "A" or "B." *Id.* This "A" application-to-"B" application examination scheme, in effect, gave PMC an additional bite at the apple to extend out prosecution of its many claims without the cost of having to file a continuation application.[3]

The court determined that the Consolidation Agreement alone does not operate to shift blame on the PTO. J.A. 34–35 (CL 24). The court explained that the Consolidation Agreement had to be understood in the context of PMC's business-driven, unreasonable prosecution strategy. J.A. 36 (CL 28–30).

Specifically, the court explained that prior to the GATT, PMC had an express prosecution policy of pursuing one application at a time and filing a continuation as the prior application reached issuance—with the sole purpose to delay issuance of PMC's patents in order to extend PMC's patents' terms.[4] In addition, the court discussed

---

[3] The record does not explain how PMC and the PTO decided on the elements of the Consolidation Agreement.

[4] *See* J.A. 6 (FF 15) (discussing a 1990 document stating "[PMC's] strategy is to prosecute coverage on its

other documents from the same time period describing PMC's strategy at the time of hiding its technologies, "quietly monitor[ing]" infringement, and "roll[ing] out" patents over time because "[o]nce infringement becomes widespread in an industry, the patented technology becomes so deeply embedded in commercial products that design around is not an option to infringers."[5]

The court analyzed prosecution conduct concerning the asserted '091 patent and found that PMC used the Consolidation Agreement "to realize [PMC's] initial strategy of serialized prosecution, notwithstanding the GATT amendments." J.A. 36 (CL 28). In particular, the court explained that on July 18, 2002, the PTO accepted PMC's request to designate Application No. 08/485,507 (the "'507 application") as the "B" application corresponding to Application No. 08/474,145 (the "'145 application") and suspend prosecution of the '507 application. J.A. 19 (FF 57). On February 4, 2003, PMC amended claim 22 of

---

technologies *deliberately over time* in such a way that broad coverage is in effect at any given time while *the duration of coverage is prolonged as long as possible*." (quoting J.A. 37730–31)); J.A. 6 (FF 16) (discussing an April 1992 document explaining that PMC "believes that its intellectual property position will enable it to exercise far-reaching market control for *as long as 30 to 50 years*." (quoting J.A. 39220)).

5   *See* J.A. 7 (FF 17–18) (discussing J.A. 37817); *see also* J.A. 7–8 (FF 19–20) (discussing a document dated September 12, 1991, that states, "[i]n some cases markets had not yet matured to benefit from applications of [PMC's] technologies . . . [so PMC] *had deliberately chosen not to publicize widely its technologies or plans*" and targets Apple as one of several "companies that are natural candidates for participating in the commercialization of [PMC's] technologies." (quoting J.A. 37865, 37870)).

the '145 application. J.A. 22 (FF 61). The amendment changed the claim from "[a] method of enabling a programming presentation at a receiver station" to "[a] method of **decrypting** programming at a receiver station" and introduced various encryption and decryption steps:

| '145 application claim 22 (March 15, 2002 amendment) | '145 application claim 22 (February 4, 2003 amendment) |
|---|---|
| A method of enabling a programming presentation at a receiver station, said method comprising the steps of: | A method of ~~enabling a~~ **decrypting** programming ~~presentation~~ at a receiver station, said method comprising the steps of: |
| receiving an information transmission from at least one of a local source and a remote source, said information transmission including disabled information; | receiving an information transmission ~~from at least one of a local source and a remote source, said information transmission~~ including ~~disabled~~ **encrypted** information; |
| detecting the presence of an instruct-to-enable signal, said instruct-to-enable signal designating enabling information; | detecting the presence of an instruct-to-enable signal~~, said instruct-to-enable signal designating enabling information~~; |
| passing said instruct-to-enable signal to a processor; | passing said instruct-to-enable signal to a processor; |
| modifying a fashion in which said receiver station locates said enabling information in response to said instruct-to-enable signal; | ~~modifying~~ **determining** a fashion in which said receiver station locates ~~said enabling information in response to~~ **a first decryption key by processing** said instruct-to-enable signal; |
| locating said enabling information based on said step of modifying a fashion; | locating said ~~enabling information~~ **first decryption key** based on said step of ~~modifying a fashion~~ **determining**; |
| enabling said disabled information based on said step of locating said enabling information; and | ~~enabling~~ **decrypting** said ~~disabled~~ **encrypted** information ~~based on said step of locating said enabling information~~ **using said first decryption key**; and |
| outputting said programming presentation based on said step of enabling said disabled information.

(DTX-1568 at 978) | outputting said programming ~~presentation~~ based on said step ~~of enabling said disabled information~~ **decrypting**.

(DTX-1568 at 1132, 1177) |

*Id.* The court found that the February 4, 2003 amendment was the first time that encryption, decryption, and decryption keys were a part of this claim. *Id.*

That same year, the PTO stayed the prosecution of PMC's applications pending resolution of eleven reexamination proceedings on related, issued patents. J.A. 16 (FF 46). The stay lasted several years, as reexamination continued, and was lifted in 2009. J.A. 16 (FF 46–47).

Once prosecution reopened, the PTO rejected amended claim 22 of the '145 application claiming the "decrypting programming" method. J.A. 23 (FF 63). PMC subsequently amended claim 22 significantly, and the '145 application ultimately issued. *Id*.

But on April 11, 2011, PMC ***reintroduced*** the rejected "decrypting programming" method claim to the '507 application (the corresponding "B" application), as a part of several other claim amendments. J.A. 23 (FF 64). PMC told the PTO that the amendments "place the claims in condition for allowance," despite the "decrypting programming" claim having previously been rejected. *Id*. This time, however, the claim was allowed in large part. J.A. 24 (FF 65). The '507 application issued as the asserted '091 patent, with the reintroduced claim as claim 13. *Id*. The '091 patent is set to expire in 2027—forty years after its 1987 priority date.[6] J.A. 36 (CL 30).

The court concluded that "the only rational explanation for PMC's approach to prosecution is a deliberate strategy of delay" and that "PMC's actions were a conscious and egregious misuse of the statutory patent system." J.A. 38 (CL 35). Thus, the court found that Apple met its burden to prove the first element of laches.

The court then turned to prejudice. J.A. 38–41 (CL 36–47). The court explained that Apple had already begun developing the accused FairPlay system by 2003, the year that PMC first added the asserted technology to the '091 patent's predecessor. J.A. 39–40 (CL 38–43). Further, the '091 patent issued in 2012—seven years after FairPlay

---

[6]    The parties appear to dispute whether the '091 patent also claims priority to PMC's 1981 application. *Compare* Appellant's Br. 8, *with* Resp. Br. 3. We do not resolve this dispute as it is unnecessary for the purposes of this appeal.

had already matured into the version accused of infringement. J.A. 39 (CL 38). The court reasoned that the prosecution delays had to be understood in the context of PMC's expressed desire to extend its patent rights as long as possible and conceal its inventions until infringement was deeply embedded into the industry. J.A. 40 (CL 45). This scheme contributed to the prejudice, which was underscored by the fact that a jury found that Apple's FairPlay technology infringed the '091 patent. J.A. 39 (CL 39). Thus, Apple established prejudice, and laches rendered the '091 patent unenforceable.

PMC timely appeals the laches determination. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## STANDARD OF REVIEW

We review a district court's determination of prosecution laches for abuse of discretion. *Cancer Research Tech. Ltd. v. Barr Labs Inc.*, 625 F.3d 724, 728–29 (Fed. Cir. 2010). "'We may find an abuse of discretion on a showing that the court . . . exercised its discretion based upon an error of law or clearly erroneous factual findings.'" *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1349 (Fed. Cir. 2020) (quoting *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363, 1379 (Fed. Cir. 2008)).

## DISCUSSION

Prosecution laches is an equitable affirmative defense dating back to the early 1900s. *Hyatt*, 998 F.3d at 1360. Prosecution laches may render a patent unenforceable where a patentee's conduct "constitutes an egregious misuse of the statutory patent system." *Id.* at 1360–61 (citation omitted). Prosecution laches requires proving two elements: (1) the patentee's delay in prosecution must be unreasonable and inexcusable under the totality of circumstances and (2) the accused infringer must have suffered prejudice attributable to the delay. *Id.* at 1362. We conclude that the district court did not abuse its discretion by

legally erring or making clearly erroneous factual findings in determining that Apple established both laches elements.

### Unreasonable and Inexcusable Delay

PMC argues that the district court erred in finding an unreasonable and inexcusable delay, such that the district court failed to consider the totality of the circumstances. We disagree.

First, PMC argues legal error because its "conduct looks nothing like *Hyatt* or the handful of other cases that have found prosecution laches." Appellant's Br. 39. This is not a legal error and is factually incorrect.

Laches is an equitable and flexible doctrine that requires considering the totality of the circumstances. *Hyatt*, 998 F.3d at 1359–66. In *Hyatt,* we found that the district court improperly failed to consider the totality of the circumstances by repeatedly discounting or ignoring relevant evidence. *Id.* Thus, PMC's argument rests on a faulty premise: that PMC's conduct has to look like "*Hyatt* or the handful of other [laches] cases." Appellant's Br. 39. Setting this aside, this case is very similar to *Hyatt* and prior cases, and, in some ways, involves even more egregious facts because, as the district court found, the record shows that PMC institutionalized its abuse of the patent system by expressly adopting and implementing dilatory prosecution strategies, specifically to ambush companies like Apple many years after PMC filed its applications.

Second, PMC asserts that its "compliance" with the Consolidation Agreement and the PTO's rules precludes a finding of laches as a matter of law. Appellant's Br. III(B); *id.* at 38, 46–47, 50–51. We disagree.

In *Hyatt*, the PTO used "atypical procedures"—as it did here—to facilitate prosecution because the applicant, like PMC, had filed hundreds of burdensome GATT-Bubble applications. *Hyatt*, 998 F.3d at 1354–55, 1370. Still, we

found that the PTO met its burden to prove an unreasonable and unjustifiable delay. *Id.* at 1369. We also explained that "[a]n applicant must . . . not only comply with the statutory requirements and PTO regulations but must also prosecute its applications in an equitable way." *Id.* at 1366. Moreover, PMC's compliance with the Consolidation Agreement supports, rather than refutes, a finding of unreasonable and inexcusable delay. PMC's agreement to structure a serial examination of a claim through first an A application and then a B application gave PMC the very kind of prosecution delays that supported PMC's campaign for drawn-out prosecution. J.A. 36 (CL 28).

Third, PMC asserts that the "district court improperly disregarded the reasons for the prosecution's length." Appellant's Br. III(C). PMC points to delays in prosecution that occurred due to the PTO grappling with PMC's GATT-Bubble applications and attempting to resolve overlapping issues across many of PMC's applications. *Id.* at 42–43.

In *Hyatt*, we rejected a similar argument and explained that "a delay by the PTO cannot excuse the appellant's own delay." *Hyatt*, 998 F.3d at 1364–65 (citation omitted) (finding that the district court erroneously found the PTO solely responsible for a 9-year stay on prosecution, when the period was "directly attributable to" the applicant's conduct and the stay's outcome could have "rendered meaningless" PTO time spent examining the applications). Unlike in *Hyatt*, the district court here determined that the various prosecution delays occurred because of issues PMC intentionally created, correctly focusing on PMC's inequitable prosecution. *Compare id.* at 1365, *with* J.A. 12–13 (FF 35–36) (discussing the *In re Schneller* stay), *and* J.A. 16 (FF 46–47) (discussing the reexamination stay), *and* J.A. 35 (CL 25) ("[E]ven though the PTO suspended prosecution of PMC's applications, such is directly attributable to the manner in which PMC prosecuted its applications in the first place.").

Fourth, PMC argues that the "district court committed legal error by relying on the simple number of PMC's applications." Appellant's Br. III(D). This argument also fails.

While we discussed in *Hyatt* the fact that the applicant had filed 381 GATT-Bubble applications, we also considered other facts evidencing an unreasonable and unexplained delay. *See Hyatt*, 998 F.3d at 1353, 1367 (considering the applications' length and complexity). Thus, the district court here did not legally err by considering that PMC filed 328 GATT-Bubble applications as a part of the court's analysis, which also properly considered other relevant facts.

Fifth, PMC argues that it was a legal error for the district court to find delay due to PMC adding "narrowing" limitations directed to encryption and decryption in 2003, years after the priority date of the '091 patent. Appellant's Br. 47–48; Reply Br. 28–29. PMC, however, merely asserts that the 2003 amendments are "narrowing" without any attempt to explain why this is so, especially in view of the significant overhaul to the claims. *See id.* PMC does not cite case law holding legal error in a similar situation. In light of the significant amendments made in 2003, we are not persuaded that the district court erred in concluding that PMC unreasonably delayed in presenting the encryption and decryption subject matter.

PMC misconstrues the district court's rationale for finding delay due to the 2003 amendments. The district court faulted PMC for waiting until 2003—sixteen years after the priority date of the '091 patent and nearly eight years after PMC filed its 328 GATT-bubble applications—to include the subject encryption and decryption limitations to the claims. J.A. 39–40 (CL 38, 42). In *Hyatt*, we found that a similar delay in presenting claims was sufficient to trigger prosecution laches. *Hyatt*, 998 F.3d at 1367–68. In particular, we found that a delay of between

7–11 years to file applications and 10–19 years before presenting claims contributed to the unreasonableness of the delay. *Id.* at 1368. We also found that the district court erroneously "ignored evidence of Hyatt's pattern of rewriting or shifting claims midway through prosecution" and that it was not enough for the district court to merely note that "it is 'not unusual to see a few claims rewritten'" and that "the PTO accepted the amendments and continued examination." *Id.* at 1363. The district court properly considered the facts surrounding the amendment to find delay. J.A. 22–25, 36–38 (FF 61–67; CL 28–35).

In sum, the district court did not legally err. The district court correctly considered the totality of the circumstances and did not disregard or ignore relevant facts.

PMC also asserts that several of the district court's factual findings concerning the first laches element amount to an abuse of discretion. Appellant's Br. IV. First, PMC asserts that Apple needed an expert on PTO proceedings to support its case. *Id.* at 2, 52–53. *Hyatt* does not require PTO testimony for a laches determination to be supported, and PMC cites no case law suggesting otherwise. Nor is there any other basis in the record to suggest that the district court needed an expert's specialized knowledge to help understand the administrative records and the PTO regulations in this case.

Second, PMC argues that the district court clearly erred because it found PMC contributed to the delay by making it "virtually impossible for the PTO to conduct double patenting, priority, or written description analyses," but the PTO has issued over 100 patents to PMC. *Id.* at 52 (quoting J.A. 37 (CL 31)). That the PTO issued PMC many patents does not suggest clear error—especially given how many other facts weigh against PMC here. *See Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found.*, 422 F.3d 1378, 1380–85 (Fed. Cir. 2005) (affirming the court's

finding of laches, despite the patentee having many issued patents).

Third, PMC argues that the district court should not have considered the office actions where examiners harshly criticized PMC's prosecution strategy. Appellant's Br. 53–55. The district court was within its purview to consider these statements as evidence. J.A. 14–16, 17–19, 38 (FF 40–45, 52–55; CL 34). Further, the court properly considered the context of the criticisms and reasonably weighed them in view of other evidence.[7] *Id.*

Fourth, PMC argues that the district court clearly erred because it misinterpreted PMC's internal documents. *Id.* at 57–58. PMC argues that its document stating that PMC's "intellectual property position will enable [PMC] to exercise far-reaching market control for as long as 30 to 50 years," referred to copyrights, not patents. *Id.*

The district court did not clearly err; the document itself describes "issued and pending patents." *See* J.A. 8573. And the court corroborated this document with similar evidence. *See* J.A. 6–7 (FF 16–17); *see also* J.A. 9425–26 (testimony that PMC's patent strategy was to extend its intellectual property rights and coverage out 30 to 50 years).

---

[7] PMC also rehashes several other instances where the district court rejected PMC's interpretation of the prosecution history. Appellant's Br. 55–56 (arguing clear error by rejecting PMC testimony concerning discussions with the PTO); *id.* at 56 (disputing the district court's finding that PMC filed duplicate claims); *id.* at 56–57 (disputing the district court's finding that the prior art PMC submitted was irrelevant because "there was a reasonable explanation" for PMC submitting the references). These arguments amount to mere disagreement, not clearly erroneous factual findings.

Along those same lines, PMC argues that the district court clearly erred by considering PMC's document describing a strategy of keeping "patents hidden while industry infringement is quietly monitored" because that strategy would support "*post-issuance* laches, which since *SCA Hygiene* is not even a defense" as opposed to prosecution laches. Appellant's Br. 58 (quoting *SCA Hygiene*, 580 U.S. 328). Put simply, PMC's enforcement strategy is part of the "totality of the circumstances" here. *See Hyatt*, 998 F.3d at 1362; *see also Symbol Techs.*, 422 F.3d at 1385 (explaining that actions taken "for the business purpose of delaying [] issuance can be considered an abuse of the patent system").

In sum, the district court's factual findings were not clearly erroneous. Thus, the district court did not abuse its discretion in finding that PMC's delay in prosecution was unreasonable and inexcusable under the totality of circumstances.

### Prejudice

Laches requires that the accused infringer suffered prejudice attributable to the delay. *Hyatt*, 998 F.3d at 1362. An accused infringer can establish prejudice by proving that it "invested in, worked on, or used the claimed technology during the period of delay." *Id.* (citation omitted). We affirm the district court's finding that PMC's delay prejudiced Apple.

PMC argues that the district court abused its discretion in finding that PMC's delay prejudiced Apple. Appellant's Br. V; Reply Br. II. We disagree.

PMC argues that the district court erred because "Apple needed to prove that PMC still was engaged in egregious conduct causing delays *after 2003*, which is when the district court found Apple began developing FairPlay." Appellant's Br. 59. This argument misconstrues the record and the law.

PMC incorrectly assumes that the district court did not find that PMC was still engaging in "conduct causing delays *after 2003.*" *Id.* The district court found that the deliberate strategy of delay began at least in 1995 and continued through PMC filing this suit in 2015. *See, e.g.*, J.A. 38, 40 (CL 35, 44). The court found that in 2011, while PMC was in pre-suit negotiations with Apple, PMC reintroduced a previously-rejected claim in the '507 application (the "B" application). *See, e.g.*, J.A. 23–25, 39–40 (FF 64–67; CL 41–45). PMC did not mention the application or claim to Apple during negotiations. J.A. 40 (CL 44). PMC was able to get the claim quickly granted, assert that claim against Apple, and obtain a damages award. J.A. 3, 40 (FF 5; CL 43). This shows that the district court did not err by determining that well after 2003 PMC was still implementing its express strategy of delay to "reserve [its] patent till the trade independently develops, and then [] pounce upon it for a full term."[8] *Victor Talking Mach. Co. v. Thomas A. Edison, Inc.*, 229 F. 999, 1000–01 (2d Cir. 1916); *see also* J.A. 40 (CL 45) ("All of these events must be viewed in the context of PMC's original plans: to prosecute its patents serially over time and keep them hidden until infringement was engrained and widespread.").

---

[8] We disagree with the dissent's suggestion that the period of delay ended before 2000. *See* Dissent pp. 14–16. The district court did not clearly err in finding that the period of delay lasted until at least 2003, when PMC introduced the encryption and decryption subject matter into the '145 "A" application, and further until 2011, when PMC reintroduced the previously-rejected claim from the '145 "A" application into the '507 "B" application, for the reasons discussed in this section and above, *see* Discussion *supra* pp. 10–15.

We find no clear error in the district court's determination that PMC engaged in conduct causing delays at least through 2011. PMC ignores the effect of its Consolidation Agreement with the PTO, which permitted PMC in 2011 to re-file the same decryption claim in the '507 "B" application that was not allowed in the corresponding '145 "A" application. By taking a second bite at the examination apple through the "B" application, PMC further lengthened the examination process beyond normal prosecution procedure, creating improper delay during prosecution. That the PTO suspended prosecution for a period of time does not negate the fact that Apple had begun developing Fair-Play well before PMC was engaging in these amendments.

Even if the district court's analysis had found that the period of PMC's delay ended by 2003, the district court properly concluded that PMC's delayed presentation of the decryption claim in 2003 prejudiced Apple because, as the court found, "[i]n so delaying, PMC prejudiced Apple, which had already begun investing in FairPlay's development and continued to do so." J.A. 39 (CL 38).[9] The record indicates that Apple began developing FairPlay *before* 2003. Apple began developing FairPlay "in the early 2000s" and "launched" FairPlay with the Apple Music store in 2003. J.A. 26 (FF 71); J.A. 4713 at 684:1–4 ("Q: When did Apple begin developing FairPlay? A: In . . . the early

---

[9] Although the district court stated in a later part of its opinion that "Apple began developing FairPlay in 2003," J.A. 39 (CL 40 (citing FF 71)), we take this statement to be a typo because it refers to but is inconsistent with the district court's previous findings that "Apple began developing FairPlay in the early 2000s" and launched FairPlay "together with the Apple Music store in 2003," J.A. 26 (FF 71); *see also* J.A. 39 (CL 38) (stating that by the time PMC introduced the decryption claim in 2003, Apple "had already begun investing in FairPlay's development").

2000s"), 684:21–23 ("Q: Now, when did Apple first launch FairPlay? A: We launched FairPlay together with the Apple Music store, which I believe was in 2003"); J.A. 8085 (¶¶ 73, 76) (parties stipulating that Apple began developing FairPlay "in the early 2000s" and the iTunes Music Store launching in 2003). Because Apple began developing FairPlay in the early 2000s and launched it in 2003, Apple necessarily invested in or worked on FairPlay *before* 2003, which is undisputedly during the period of delay.

In sum, the district court did not abuse its discretion in finding that Apple established prejudice.

## CONCLUSION

The district court did not abuse its discretion in finding that Apple established laches, rendering the '091 patent unenforceable. We have considered PMC's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the district court's decision.

## AFFIRMED

### COSTS

Costs to Apple.

# United States Court of Appeals
# for the Federal Circuit

---

**PERSONALIZED MEDIA COMMUNICATIONS, LLC,**
*Plaintiff-Appellant*

**v.**

**APPLE INC.,**
*Defendant-Appellee*

---

2021-2275

---

Appeal from the United States District Court for the Eastern District of Texas in No. 2:15-cv-01366-JRG-RSP, Chief Judge J. Rodney Gilstrap.

---

STARK, *Circuit Judge,* dissenting.

I agree with the Majority that the district court did not abuse its discretion in finding, based on the totality of the circumstances, that Personalized Media Communications, LLC's ("PMC") delay in prosecuting its patent was unreasonable and inexcusable. To prevail on its laches claim, however, Apple also had to show that it suffered prejudice during the period in which PMC was wrongfully delaying prosecution. Apple failed to do so. Accordingly, I would reverse the district court's judgment that PMC's U.S.

2    PERSONALIZED MEDIA COMMUNICATIONS, LLC v. APPLE INC.

Patent No. 8,191,091 ("'091 patent") is unenforceable due to prosecution laches.[1]

I

We review the district court's conclusion that Apple met its burden to prove prosecution laches for abuse of discretion. *See Cancer Rsch. Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 728-29 (Fed. Cir. 2010) ("*Cancer Research*"). "'We may find an abuse of discretion on a showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings.'" *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1349 (Fed. Cir. 2020) (quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008)). Importantly, "we review the legal standard applied by the district court *de novo*." *Cancer Research*, 625 F.3d at 729. Thus, notwithstanding that our ultimate standard of review is for abuse of discretion, we may reverse where a district court commits legal error. *See id.* at 732.

To prevail on its prosecution laches counterclaim, Apple has to prove *both* that (1) PMC's "delay in prosecution

---

[1]    Because Apple asserted other affirmative defenses to infringement that the district court did not have to reach, I would remand for that court to address these tried but unresolved defenses. *See* J.A. 2 n.2 ("As Apple has prevailed on its counterclaim—extinguishing any liability for patent infringement—the Court does not reach Apple's affirmative defenses of obviousness-type double patenting and unclean hands."); J.A. 3 (FF 7) (noting district court heard evidence and argument on "prosecution laches, OTDP [obviousness-type double patenting], and unclean hands").

was unreasonable and inexcusable[2] under the totality of circumstances," and (2) it "suffered prejudice attributable to the delay." *Hyatt v. Hirshfeld*, 998 F.3d 1347, 1362 (Fed. Cir. 2021). Proving the prejudice necessary to succeed on a prosecution laches defense to infringement "requires proving intervening rights." *Id.* at 1369. Establishing intervening rights, in turn, requires showing "'that either the accused infringer or others invested in, worked on, or used the claimed technology *during the period of delay.*'" *Id.* (quoting *Cancer Research*, 625 F.3d at 729) (emphasis added). Because the prejudice Apple suffered must be "prejudice *attributable to* the delay," Apple must prove it was prejudiced at some point *during* the period in which PMC was engaged in unreasonable and inexcusable prosecution delay. *See Cancer Research*, 625 F.3d at 732.

Our analysis in *Cancer Research* confirms this understanding of Apple's burden. In *Cancer Research*, the district court had decided that "prosecution laches did not require a showing of intervening rights but rather turned on whether under the totality of the circumstances [the patentee's] delay in prosecution in light of the PTO's utility rejections was unreasonable and unexplained." *Id.* at 727. We rejected this conclusion and, instead, explicitly "recognize[d] intervening adverse rights as a requirement to holding a patent unenforceable for prosecution laches." *Id.*

---

[2] We have sometimes referred to the required showing as "unreasonable and *unexplained* delay," and at other times as "unreasonable and *inexcusable*" delay. *Compare, e.g.,* Maj. Op. at 3, 12 ("unexplained"); *Hyatt*, 998 F.3d at 1360 ("unexplained"); *Cancer Research*, 625 F.3d at 728 ("unexplained"), *with* Maj. Op. at 3, 9, 10, 11, 15 ("inexcusable"); *Hyatt*, 998 F.3d at 1362 ("inexcusable"); *Cancer Research*, 625 F.3d at 729 ("inexcusable"). No party argues there is any material difference between these formulations.

at 729-31.    Moreover, we declined to find intervening rights, and hence the prejudice necessary to prove laches, where an inventor merely "delay[s] in prosecuting and issuing its patent application," observing that our cases and "[t]he Supreme Court cases underlying the [laches] doctrine all rely on a finding that the applicant's delay in prosecution adversely affected others working in the same field."  *Id.* (discussing *Woodbridge v. United States*, 263 U.S. 50 (1923); *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463 (1924); *Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*, 304 U.S. 159 (1938); and *Gen. Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175 (1938)).    We then expressly held that "to establish prejudice an accused infringer must show evidence of intervening rights, *i.e.*, that either the accused infringer or others *invested in, worked on, or used the claimed technology during the period of delay*."  *Id.* at 729 (second emphasis added).

Our application of this standard to the facts in *Cancer Research*, and our conclusion as to the relevant period of delay, provides further guidance.  The patentee's predecessor filed its original patent application, which matured into the patent-in-suit, in 1982, and then in 1991 "ownership of the patent application changed hands" to Cancer Research.  *Id.* at 726.  Thereafter, Cancer Research began to move the prosecution along at a reasonable pace, and the patent eventually issued in 1993.  *See id.* at 726-27.  We found that the pertinent period during which the accused infringer had to prove prejudice was "between 1982 and 1991," *id.* at 726, 732, and did not include 1991 to 1993.

We next considered whether Barr, the party asserting prosecution laches as a defense to infringement, had developed intervening rights during the pertinent period.  Barr had filed an Abbreviated New Drug Application ("ANDA") to market its infringing product in 2007.  *See id.* at 727.  Because "Barr filed its ANDA more than thirteen years after the issuance of Cancer Research's patent," we concluded that Barr was "hardly prejudiced by the delay in the

issuance of the [patent-in-suit], in 1993." *Id.* at 731. As Barr likewise failed to identify any other way in which it or another entity[3] or the public was prejudiced by the patent applicant's delay between 1982 and 1991, it had failed to prove prosecution laches. *See id.* at 732. Any prejudice that Barr or anyone else may have developed after 1991—that is, after the patent applicant stopped acting unreasonably and inexcusably—was irrelevant to our analysis.[4]

Apple distinguishes *Cancer Research* by inviting us to eliminate the line between the "period of delay," as we understood and applied that term in *Cancer Research*, and the period *after* the pertinent delay, which is not relevant to the prejudice analysis. *See, e.g.*, Appellee's Br. 74 ("Even if it were somehow true, as PMC suggests, that PMC's affirmative misconduct had stopped by 2003, the *delay in prosecution continued* due to its [PMC's] earlier misconduct."); *id.* ("Whereas the delay in *Cancer Research* consisted of a defined period of delay . . . this case involves conduct deliberately intended to (and that did)

---

[3]    Although our cases allow a party asserting laches to satisfy the prejudice prong by identifying prejudice during the pertinent time to others besides the party itself, *see, e.g.*, *Cancer Research*, 625 F.3d at 729, Apple has not attempted to make such a showing in this case, *see* Appellee's Br. 71-77.

[4]    The dissenting opinion in *Cancer Research* was based on this very aspect of the holding. In dissent, Judge Prost disagreed with the "temporal limitation that the prejudice exist[] during the period of delay," which she faulted as a "new requirement" the *Cancer Research* majority was improperly imposing on parties asserting prosecution laches. 625 F.3d at 735-37; *see also id.* at 737 ("[I]t is not appropriate to confine the inquiry to the period of time when Cancer Research was actively delaying prosecution.").

6    PERSONALIZED MEDIA COMMUNICATIONS, LLC v. APPLE INC.

*affirmatively hamper* the PTO's examination and cause *ongoing delay in examination for years* after its occurrence."); *id.* (arguing law permits "considering the delay *resulting* from those [delaying] acts"). I believe we should reject this invitation and adhere to the legal requirement that prejudice be shown to have occurred during the patentee's period of unreasonable and inexcusable delay.[5] If we were to do so, it would follow that Apple has failed to meet its burden and the district court's finding of laches could not stand.

II

Turning to the facts before us, there is no material dispute as to the date by which Apple obtained intervening rights in the technology the jury found to be infringing. The acquisition of such intervening rights depends on the timing of Apple's "invest[ment] in, work[] on, or use[]" of the infringing FairPlay technology. *Cancer Research*, 625 F.3d at 729. The district court found that Apple proved it began this work "in the early 2000s." J.A. 26 (FF 71). The Majority affirms this finding and I agree it is not clearly

---

[5]    In *Hyatt*, 998 F.3d at 1370, we said that "where a patent applicant has committed a clear abuse of the PTO's patent examination system, the applicant's abuse and its effects meet the prejudice requirement of prosecution laches." I read this statement as limited to the § 145 context in which *Hyatt* arose, where the entity confronting the burden to show prejudice was the PTO, not a patent infringer. It makes sense that the PTO can show prejudice by proving it, the PTO, was clearly abused by the applicant. I am not aware of this Court making similar statements when the party asserting prosecution laches is an accused infringer.

erroneous.  The earliest date by which Apple obtained intervening rights, then, was January 2000.[6]

Consequently, Apple must also prove that PMC was engaged in unreasonable and inexcusable prosecution delay in or after January 2000.  If all of PMC's improper delay concluded before January 2000, before Apple began working on FairPlay, then whatever prejudice Apple suffered is not "attributable to" PMC's delay.  While Apple does not agree that this is the proper analysis—believing, as it persuaded the district court, that the lingering post-2000 impact of PMC's pre-2000 delay is sufficient to make Apple's post-2000 development of FairPlay dispositive in our prejudice analysis—it contends, in the alternative, that it proved unreasonable and inexcusable prosecution delay after 2000.  I disagree.

As PMC observes, the district court's focus in finding delay was primarily on PMC's activities between 1987 and

---

[6]    In fact, the record strongly suggests that Apple did not work on what became FairPlay until 2002.  Apple's appellate briefing indicates Apple started developing FairPlay *after* launching iTunes and the iPod in late 2001.  *See* Appellee's Br. 22 (citing J.A. 4706-07, 4712-13, 8085 (Stip. ¶ 76)).  In closing argument at the bench trial, Apple's counsel told the district court that FairPlay "[l]aunched in April of 2003, [and was] developed shortly before that." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 2:15-cv-01366, ECF No. 645 (Bench Trial Transcript), at 237.  Moreover, FairPlay did not "mature[]" into the version that infringes the asserted claims until perhaps as late as 2005.  J.A. 39 (CL 38) ("By 2005 . . . FairPlay had matured into the version accused of infringement."); *see also* J.A. 26 (FF 72).  Because PMC's unreasonable and inexcusable delay had ended before 2000, the specific date in the 2000s when Apple acquired intervening rights is immaterial.

1995.  The district court relied on the number of applications PMC filed in 1995, and the fact that "PMC's 328 applications derive[d] from two earlier applications, respectively filed in 1981 and 1987.  These pre-date PMC's 1995 applications by 8 to 14 years."  J.A. 32 (CL 17).  The district court compared PMC's filing delays to the delays involved in *Hyatt*, concluding that "PMC delayed filing of its applications for a comparable period."   J.A. 32-33 (CL 18).  The district court noted that PMC's applications were filed with a small number of claims, J.A. 33 (CL 19), which were later multiplied and amended, J.A. 33-34 (CL 21), and the applications themselves were lengthy and complex, J.A. 33 (CL 20).  The district court also pointed to the large number of references PMC disclosed as pertinent prior art.  J.A. 34 (CL 22).

When addressing PMC's post-2000 prosecution conduct, the district court specifically mentions a 2002 office action, which PMC was slow in responding to; a 2003 amendment to what became independent claim 13 of the '091 patent; and PMC's 2011 reintroduction—as a proposed "B" application claim—of what had been rejected as an "A" application claim and eventually became claim 13 of the '091 patent.  Thus, the only conduct after 2000 that either the district court or Apple points to as constituting unreasonable and inexcusable prosecution delay is: (i) the 2002 failure to respond promptly to an office action; (ii) the 2003 claim amendment; and (iii) the 2011 reintroduction of what became claim 13 of the '091 patent.  As I see it, none of these actions, either individually or as part of the totality of circumstances, were the type of "egregious misuse of the statutory patent system" we have required to find prosecution laches.  *Cancer Research*, 625 F.3d at 728.

A

Apple points to PMC's January 2003 response to a July 2002 office action as abusive prosecutorial conduct.  *See* Appellee's Br. 45-46.  While I agree with Apple that the

district court could properly consider this evidence, I disagree that PMC's activities in 2002 and 2003 widen the window of unreasonable and inexcusable delay to a period after 2000.

In the July 2002 office action, the examiner expressed frustration with PMC's "misle[a]d[ing]" statements about priority dates for the claims in U.S. Patent Application No. 08/474,145 ("'145 application"). J.A. 15 (FF 43). The examiner wrote that the PTO "continue[d] to struggle in its efforts to make [§ 112 ¶ 1] determinations for the 10,000 or so pending amended claims," adding that PMC failed to identify "*precisely what is being claimed.*" J.A. 16 (FF 44) (emphasis and alteration in original).

The office action specified a three-month period during which PMC could reply, while also noting that extensions might be available under 37 C.F.R. § 1.136(a), adding that in no event could a reply be filed more than six months after the July 31, 2002 mailing date of the office action. J.A. 48027-28. Precisely six months after the mailing date, on January 31, 2003, PMC filed its reply, simultaneously requesting a three-month extension under § 1.136(a) and paying the fee for the extension. J.A. 48135-36. PMC's January 2003 reply thoroughly responded to the examiner's concerns. *See* J.A. 48137-80. Thereafter, prosecution proceeded, including by PMC filing two information disclosure statements. *See* File History of U.S. Patent No. 7,992,169 (showing information disclosure statements filed on February 7, 2003, and May 5, 2003); *see also* J.A. 48299.

The district court found that the July 2002 office action was a relevant example of PMC's prosecution misconduct, *see* J.A. 15-16 (FF 42-45), although the district court did not rely on or cite to these findings of fact in explicating its conclusions of law on unreasonable and inexcusable delay or prejudice, *see* J.A. 30-41 (CL 11-47). The district court also did not make any finding regarding PMC's January 2003 reply, *see* J.A. 15-16 (FF 42-45), a reply which

appears to have been timely, *see* J.A. 48136 (PMC requesting three-month extension and paying fee, "thereby extending the period for response to January 31, 2003"). The "give and take" between the examiner and PMC in and around the July 2002 office action and January 2003 reply is routine, not unreasonable and inexcusable. *See In re Buszard*, 504 F.3d 1364, 1366-67 (Fed. Cir. 2007) ("The patent examiner and the applicant, in the give and take of rejection and response, work toward defining the metes and bounds of the invention to be patented.").

In short, I do not see how PMC's prosecution conduct in connection with the July 2002 office action constitutes unreasonable and inexcusable delay that could give rise to Apple developing intervening rights in the 2002 or 2003 timeframe. And neither the district court nor the Majority explain how it could.

B

The district court also found that PMC's February 4, 2003 amendment "was the first time that encryption, decryption, or decryption keys" appeared in the '145 application's claims. J.A. 22 (FF 61). The Majority finds no abuse of discretion in this finding. *See* Maj. Op. at 6-7, 15. I view the question of whether the amendment added encryption, decryption, and decryption keys to the claims as a matter of claim scope and, therefore, an issue of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). Moreover, I am persuaded that each of these limitations was within the scope of the pre-amendment claims and, therefore, the amendment was a routine narrowing amendment. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016) ("[T]he patentee can amend the claim language during prosecution—and narrow it if necessary—to clarify the scope of the invention and avoid rejection or cancellation of the claims."); *see also In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989) ("[D]uring patent prosecution . . . claims can be

amended, ambiguities should be recognized, scope and breadth of language explored, and clarification imposed.").

As the Majority explains, the 2003 "amendment changed the claim from '[a] method of enabling a programming presentation at a receiver station' to '[a] method of decrypting programming at a receiver station,' and introduced various encryption and decryption steps." Maj. Op. at 7 (internal emphasis omitted). The Majority, district court, and Apple all fail to provide any reason to view this amendment—to the claim's preamble—as even a claim limitation, and certainly not one that broadens claim scope. *See generally Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008) ("[I]n general, the purpose of a claim preamble is to give context for what is being described in the body of the claim; if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation.").

The amendment additionally changed "*enabling* said *disabled* information" to "*decrypting* said *encrypted* information," and similarly changed other instances of "enabling said disabled information" to "decrypting;" "disabled information" to "encrypted information;" and "enabling information" to "decryption key." J.A. 22 (FF 61). These amendments narrowed and limited the scope of the claims to encryption, decryption, and decryption keys, elements that were present in the claims at least as far back as 1997. *See, e.g.*, J.A. 40125, 40139 (June 10, 1997 response to office action, showing amendment and request for reconsideration in connection with U.S. Patent Application No. 08/485,507 ("'507 application"), stating: "One place where the specification discloses enabling information and *disabled (encrypted) information* begins on page 297 line 20 and goes through to page 298, line 21.") (emphasis added); J.A. 27711, 27734 (PMC designating certain pending

applications—including '507 and '145—as "relat[ing] to decryption of broadcast information," also known as "DECR").

Prior to the 2003 amendment, one could practice the claims by disabling information using mechanisms other than encryption, and enabling information could be of a type other than decryption keys. Moreover, disabled information could be enabled without specifically decrypting it via a decryption key. After the 2003 amendment, by contrast, the claims were *narrowed* to encryption, decryption, and decryption keys. There was nothing unreasonable, inexcusable, or even unusual about this routine amendment. Therefore, Apple has not shown that any prejudice it suffered in 2003 is attributable to PMC's prosecution delay.

C

Apple portrays PMC's conduct in 2011, which had the effect of amending the '091 patent's independent claim 13, as "one of its more egregious tactics." Appellee's Br. 76. The Majority "find[s] no clear error in the district court's determination that PMC engaged in conduct causing delays at least through 2011." Maj. Op. at 17. But PMC's 2011 claim amendment was permitted by the Consolidation Agreement reached between PMC and the PTO. I do not believe PMC's compliance with the Consolidation Agreement justifies a finding that PMC's unreasonable and inexcusable delay persisted until 2011.

As the parties stipulated in the district court, a key component of the Consolidation Agreement was: "Applicants and the PTO agreed that, in order to expedite allowance of patentable claims, if there were claims that remained finally rejected in an application, those claims were to be moved to the 'B' Application for further action, and the 'A' Application would be allowed to issue." J.A. 8082 (Stip. ¶ 50). Consistent with this Agreement, in or around 2000, PMC designated the '145 application an "A" application and the '507 application as the corresponding "B" application. J.A. 18 (FF 54). Pursuant to the

Consolidation Agreement, PMC "[m]aintain[ed] application B as a potential application for any claims not allowed" in the A application. J.A. 27725. When, in April 2011, PMC reintroduced via the '507 "B" application claim 45—which is identical to claim 22 of the '145 "A" application as it existed after its February 4, 2003 amendment—it was acting in accordance with the Consolidation Agreement to which the PTO had agreed. After minimal further amendments, claim 45 of the '507 application issued as independent claim 13 of the '091 patent, and the jury later found Apple infringed "at least one of claims 13, 14, 15, and 16 of the '091 patent." J.A. 27 (FF 73).

PMC explained to the examiner exactly what it was doing with its 2011 submissions, writing: "Consistent with the consolidation agreement between the Applicants and the Office, Applicants now wish to pursue the subject matter within the scope of the 'A' claims of the DECR 87 group 'A' application (U.S. Patent Application Serial No. 08/474,145) by claiming such subject matter that was not patented in the 'A' application in the instant 'B' application." J.A. 16864. PMC also sought to "aid the Examiner in understanding the amendments to the claim[s]" by "attach[ing] a marked up copy of the claims (Appendix A) indicating the differences between the 'A' Claims and the amended form submitted herein." *Id.* Furthermore, PMC signed a terminal disclaimer that "disclaim[ed] the terminal portion of any patent granted on [the '507] application which would extend beyond the expiration date of [the '169 patent]." *Apple Inc. v. Personalized Media Commc'ns., LLC.*, No. IPR2016-00755, Ex. 1040, at 6 (P.T.A.B. March 14, 2016) (March 2012 Notice of Allowance for '507 application).

As the Majority points out, "[t]he record does not explain how PMC and the PTO decided on" the provisions of the Consolidation Agreement, including the "A" and "B" application provisions. Maj. Op. at 5 n.3. While the Consolidation Agreement does not necessarily render all actions

14   PERSONALIZED MEDIA COMMUNICATIONS, LLC v. APPLE INC.

taken by PMC pursuant to it reasonable and excusable, I would find that, under the totality of circumstances, Apple failed to show PMC's 2011 conduct, which is consistent with the Consolidation Agreement, renders 2011 a pertinent time during which Apple could have suffered prejudice attributable to PMC's delay.[7]

## III

Today's holding, which allows Apple to prevail on laches by proving it suffered prejudice in and around 2003, due to the ongoing impact of prosecution delays PMC caused primarily between 1987 and 1995, implies that PMC was doomed to procure unenforceable patents regardless of how well it conducted itself after 1995, and no matter how egregious Apple's infringement might be. This outcome, which renders irrelevant years of PMC's conduct (i.e., 1995 to 2003 and beyond), is inconsistent with the totality of circumstances analysis required for assessing application of prosecution laches. *See Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable.") (internal footnote omitted); *see also Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., LP*, 422 F.3d 1378, 1385-86 (Fed. Cir. 2005). It is also in tension with our holding in *Hyatt*, in which we suggested that, even decades into the prosecution, when the PTO "notified Hyatt of its own obligations and requirements and thereby gave him the opportunity *to avoid prosecution laches*," 998

---

[7]   We stated in *Hyatt*, 998 F.3d at 1369, that a "clear abuse of the patent system" can exist even if the prosecution tactics do "not literally violate regulations or statutory provisions." This does not mean, however, that the permissibility of the patentee's conduct, including if it was undertaken pursuant to an agreement the PTO chose to enter into, is irrelevant to weighing the equities of the overall situation.

F.3d at 1366 (emphasis added), Hyatt's subsequent cooperation with the PTO could, even then, have saved his patents. In *Hyatt*, we "remand[ed] to the district court for the limited purpose of affording Hyatt the opportunity to present evidence on the issue of prosecution laches," *id.* at 1371, which we would not have done had the ongoing impact of Hyatt's delays already conclusively established that his patents were unenforceable.

In my view, Apple failed to prove it obtained intervening rights in the accused technology any sooner than 2000, as that is the earliest date it was possibly working on what became the infringing FairPlay product. Apple also failed to prove that PMC unreasonably and inexcusably delayed prosecution in or after 2000. As Apple did not establish any time during which there was both delay and prejudice, Apple did not demonstrate it suffered prejudice "attributable to" PMC's delay. Therefore, Apple did not meet its burden to prevail on its prosecution laches counterclaim. The district court's contrary finding, which I believe is based on an incorrect reading of the law—one which wrongly permitted Apple to persuade the court that PMC's delay had material lingering effects as late as 2011—should be reversed.[8] Accordingly, I respectfully dissent.

---

[8]    The prejudice prong of the prosecution laches test received very little attention in the parties' appellate briefs, covering just 11 of the 167 pages of briefing we received. *See* Appellant's Br. 59-60; Appellee's Br. 71-77; Appellant's Reply Br. 29-30. The parties seem to have taken the same approach in the district court. Near the conclusion of the bench trial on equitable issues, the district judge was left to ask Apple's counsel to "in one sentence, tell me what the prejudice to your client is," to which the response was: "Well, the prejudice is that, had these applications been prosecuted diligently as they should have been, that the invention that is being claimed in the '091 patent would

---

have been long since in the public domain." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 2:15-cv-01366, ECF No. 645 (Bench Trial Transcript), at 239-40; *see also id.* at 261 ("[Apple] has been prejudiced the same way the public has been prejudiced, that the term of the patent monopoly was shifted."). The parties' decision to devote scant consideration to prejudice undoubtedly increased the challenge confronted by the district court.